Hermione KING, Appellant,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Appellee.

No. 23597.

United States Court of Appeals
Fifth Circuit.

Aug. 29, 1967.

Petition for Rehearing En Banc Denied
Nov. 8, 1967.

On Application for Rehearing En Banc
Dec. 7, 1967.

On Rehearing En Banc Feb. 19, 1968.

William A. Barber, Jr., Grand Prairie, Tex., for appellant.

Richard B. Hardee, Asst. U. S. Atty., Tyler, Tex., Morton Hollander, William Kanter, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before WISDOM, COLEMAN and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

Hermione King brought this action under section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to obtain judicial review of a determination by the Secretary of Health, Education and Welfare that she was not entitled to Child's Survivors Insurance Benefits under section 202(d) of the Act, 42 U.S.C.A. § 402 (d).[1] The district court affirmed the determination of the Secretary and dismissed Miss King's complaint. We hold that the Secretary failed to inquire into an important aspect of the matter and remand for further proceedings.

In 1963 Miss King filed an application for benefits, alleging disability by reason of rheumatic heart disease from March,

---

1. § 402. Old-age and survivors insurance benefit payments—
 Old-age insurance benefits
 \* \* \* \* \*
 Child's insurance benefits
 (d)(1) Every child (as defined in section 416(e) of this title) of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, if such child—
 (A) has filed application for child's insurance benefits,
 (B) at the time such application was filed was unmarried and either (i) had not attained the age of eighteen or (ii) was under a disability (as defined in section 423(c) of this title) which began before he attained the age of eighteen, and
 (C) was dependent upon such individual—
 \* \* \* \* \*
 (ii) if such individual has died, at the time of such death,
 \* \* \* \* \*
 shall be entitled to a child's insurance benefit \* \* \*.

1946, to the date of application. The application was denied, and upon reconsideration at her request the disallowance was affirmed. A hearing was held before an examiner at Miss King's request, at which she was represented by an attorney.

Evidence produced at this hearing (and in earlier dealings with the Secretary) tended to show the following: Miss King was born June 10, 1929, and was eighteen on June 10, 1947. She was considered a sickly child and at about the age of six had rheumatic fever with a possible recurrence in 1946. Her father died in 1962 and she since has lived quietly with her mother in Mt. Vernon, Texas. In 1947 she had a "fainting spell" that was diagnosed by a chiropractor as a heart attack. She is considerably overweight, believes that she has a serious heart condition, and avoids physical exertion. She testified to chest pains, to a "squeaking" noise from her heart so loud that it could be heard in other rooms and that her present condition probably was worse than a year preceding. She also is afflicted with a number of physical ailments unrelated—or only indirectly related—to any existing heart condition.

After high school, Miss King was employed for several months as a practical nurse at a local hospital. She testified that although not assigned heavy tasks she worked only sporadically and "couldn't hold out." For one week she kept books for an uncle, and for less than one month clerked in a five and ten cent store. In an early interview with the Social Security Office, Miss King reported that she had unsuccessfully tried to find work in Mt. Vernon.

Two physicians who had treated Miss King diagnosed her condition as rheumatic heart disease of a static or slowly progressive nature. A third noted that she had an unusual heart murmur and that he had hospitalized her in 1950 with a diagnosis of congenital heart disease with possible secondary rheumatic fever. Dr. Walling, who had treated Miss King from 1958 to the time of application, diagnosed her condition as rheumatic heart disease with mitral stenosis, and indicated that the condition was static; he observed that she was unable to work because of fatigue symptoms but that X-rays taken in 1957 showed her heart normal in size and shape.

A physician who examined Miss King under authorization of the Secretary reported that an electrocardiogram taken after exercise showed multiple premature beats which disappeared with rest. Chest X-rays showed clear lung fields and normal heart shadow. He concluded that Miss King "does not take very good care of herself in the fact that she has allowed herself to become very obese and she smokes cigarettes. By stopping smoking and losing her excess weight and improving her general physical condition she should be able to carry on her normal household activities without difficulty."

The hearing examiner found that Miss King had never been married and was dependent upon her father, an insured individual within the meaning of section 202(d), at the time of his death. This never has been disputed and we treat it as established. After finding that Miss King had suffered from rheumatic fever "or some form of heart disease" when five or six years old, the examiner concluded that any impairment which occurred was remediable[2] and consequently found "no need to further burden [the] decision with a lengthy recital of the

---

2. This seems to have been directed in part at least at the examiner's conclusion that "if the claimant reduces her smoking, loses her excess weight and improves her general physical condition, she would be able to carry on normal household activities without difficulty" (referring her to the Royal Canadian Exercise Plans for Physical Fitness). The examiner implied that weight reduction might increase the activities which Miss King's heart condition allowed, but the record contains little evidence bearing on this matter; this would certainly be a proper matter to investigate in more detail on remand.

jobs and opportunities the claimant can do within her many residual capabilities." Since she had not shown "medically determinable physical impairments of long-continued and indefinite duration which will preclude her from engaging in substantial gainful activity," Miss King was held not entitled to benefits.

A request for review was granted by the Appeals Council. After a review of the evidence presented to the hearing examiner, the Council concluded that although Miss King had had rheumatic fever before the age of eighteen the only objective signs of present heart disease were a heart murmur and temporary electrocardiographic changes after exercise. Consequently it held that she presently did not have "significant heart disease" and did have the physical reserve and the educational background to perform at least light work activity. She had not, therefore, been under a "disability" as defined in the Act since the age of eighteen.[3] The present action was then filed to obtain judicial review of this determination.

The sole question before the district court, and now before us, is whether the Secretary properly concluded that at the time of the application Miss King was not under a disability which began before the age of eighteen. Section 202(d) (1) uses "disability" as defined in section 223(c), 42 U.S.C.A. § 423(c):

"(2) The term 'disability' means—

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months * * *."[4]

It is clear from the statutory language that the determination of disability involves a two-step inquiry. First, it is necessary to determine whether "any medically determinable physical or mental impairment" exists. Second, it is necessary to inquire whether this impairment is causally related to an "inability to engage in any substantial gainful activity." See Cyrus v. Celebrezze, 341 F.2d 192, 194 (4th Cir., 1965).

The statutory requirement that an impairment be "medically determinable" has been elaborated upon by the Social Security Administration Regulations, 20 C.F.R. 404.1510(a).[5] We do not read the findings of the hearing examiner and of the Appeals Council as determining that no impairment meeting the statutory definition was present. While Miss King's testimony as to her symptoms—severe pain, fatigue, shortness of breath, etc.—may have been insufficient to establish an impairment (a question we need not here decide),[6]

---

3. Since it found no significant impairment, the Council explicitly declined to discuss the question of remediability.

4. The twelve-month requirement was inserted by a 1965 amendment to the Act; prior language had required only that the impairment "be of long-continued and indefinite duration." For purposes of this case the change in statutory language is not material.

5. § 404.1510 Medical factors in determining effect of impairments.
 (a) In order to establish that a medically determinable physical or mental impairment (see § 404.1501(a) or (b) (1)) is present there should be evidence that medically discernible anatomical, physio-

logical, biochemical or psychological aberrations exist. Allegations of inability to work as a result of impairment such as dyspnea (shortness of breath), pain, lack of musculoskeletal function, decreased vision or hearing, decreased memory, etc., should be shown to result from structural, physiological or psychological changes which can be identified by the use of clinical and laboratory diagnostic techniques. An alleged impairment is medically determinable only if it can be verified by the use of clinical and laboratory diagnostic techniques.

6. See Davidson v. Gardner, 370 F.2d 803 (6th Cir., 1966) where the opinion of the court (with two members of the panel concurring in the result) indicated that

the Appeals Council specifically found a presently-existing heart murmur and temporary electrocardiograph changes after exercise. We agree that this constitutes sufficient evidence of "medically discernable * * * physiological aberrations" to establish a "medically determinable physical * * * impairment" under the Regulations. But whether that impairment is substantial enough to constitute a disability within the meaning of the Act involves another inquiry.

 In determining whether or not the impairment was serious enough to result in a disability within the meaning of the Act both the hearing examiner and the Appeals Council gave primary consideration to whether the impairment would prevent Miss King from performing the tasks involved in employment situations. Both concluded it would not and that she was physically able to perform "almost any task which would not require arduous or sustained, vigorous physical activity" (in the words of the examiner) or "at least light work activity" (according to the Appeals Council's finding). We accept these as having support in the record.

 But this does not end the inquiry. In Gardner v. Smith, 368 F.2d 77 (5th Cir., 1966) we made clear that the determination of disability did not end with a determination that an impairment did not affect the ability of the claimant to perform the work involved in theoretically available employment but must continue to a determination of whether the claimant has "a reasonable opportunity to be hired if [jobs] were open and applications for employment were being taken." We noted:

"If a physical or mental impairment prevents one from obtaining a job, or from even being considered for the job, he is just as unable to engage in that activity as he would be were he unable to perform the work after he had obtained the employment. The ability to perform work existing in the appropriate labor market requires a determination of whether the claimant would be considered for employment if a job vacancy occurred. If, in practice, the claimant could not reasonably be expected to be hired, then no job exists for him."

The record contains no findings—and almost no inquiry—regarding this important issue. As this court said in Bridges v. Gardner, 368 F.2d 86 (5th Cir., 1966):

"Mere ability to perform * * * jobs is insufficient to justify a denial of disability benefits. Specific findings * * * are necessary on the issue of whether claiment's physical condition would prevent him from being hired or from competing for jobs for us to determine whether correct legal standards have been applied in deciding this case. If claimant's physical condition is such that he can engage in some substantial gainful activity, such as light work * * * it is necessary also that there be a showing of a reasonable opportunity for the claimant to compete in the manner normally pursued by persons genuinely seeking work, for a job within his determined capabilities.

* * * * * *

"Until proper findings are made we are unable to sustain the present decision as supported by substantial evidence." [7]

---

if the regulation meant that "impairments, in order to be medically determinable, must be verified by *clinical and laboratory diagnostic techniques*", the court would decline to approve application of the regulation.

7. The absence of inquiry into or findings concerning this question would alone jus-tify remand. But this disposition is further indicated by a statement of Miss King's attorney who, the record suggests, was an older, well-established member of the community. In response to the examiner's questions, "Now is there anything that you know of in her background that would go to the heart of this disability question that we haven't

The same disposition was made in Harrison v. Gardner, 369 F.2d 172 (5th Cir., 1966).

We therefore direct the remand of the case to the Secretary for further proceedings in light of the standard set out in Gardner v. Smith, supra.[8]

Reversed and remanded.

WISDOM, Circuit Judge (dissenting):

I respectfully dissent.

This case is one of a lengthening line of cases which, to my mind, frustrates the will of Congress by converting the disability insurance provisions of the Social Security Act into an unemployment compensation law.[1]

With deference to my brothers in this case and in the cases relied on by the majority, I feel compelled to dissent from what I regard as a judicial intrusion on the administrative process and the Congressional scheme of insurance disability benefits. This intrusion imposes on the Secretary the affirmative duty of determining employability as well as disability, i. e. of finding (naming) particular jobs available in the claimant's community or geographic working area to persons having the claimant's special skills and particular impairment. The effect is to define disability in the very terms Congress carefully avoided. It turns the statutory burden of proof topsy-turvy. It ignores the Secretary's broad power and expertise in determining evidentiary standards. The Court's approach violates the words and the spirit of the Act.

I.

When this case was before the district court and when it was briefed and argued before this Court, the parties agreed that the only question at issue was whether substantial evidence supported the administrative findings. The Court has sent that issue into orbit. Now, without the Secretary's having an opportunity to address himself to the point, the Court considers that the sole issue is whether the Secretary applied the proper standard in denying disability. This standard is not a statutory standard but is a judge-made rule that the Secretary cannot deny disability benefits without first making a "determination of whether the claimant has 'a reasonable opportunity to be hired if [jobs] were open and applications for employment were being taken'." Gardner v. Smith, 5 Cir. 1966, 368 F.2d 77.

Taking the test at its face value, I do not understand why the findings fail to meet the Court's requirement. The Ap-

---

brought out this morning and isn't in the file or in the record?", the attorney stated:

"I do know that from the general knowledge that the people have in Mt. Vernon of her condition renders it impossible for her to secure employment of any kind, even if she wanted."

If it is true, as this suggests, that the prospective employers in the geographic area are aware of Miss King's impairment and erroneously believe that it would prevent her from performing the physical activities involved in employment, a disability may well exist. If, of course, any unwillingness to consider her for employment is due to physical conditions unrelated to her heart problems, no causal relationship between the impairment with which we are concerned and inability to engage in employment would exist.

8. It may be necessary for the Secretary to reach the issue of remediability. See 20 C.F.R. 404.1502(g). But only if the problems remediable are those on which the alleged disability is based; see note 2, supra.

1. Professor Jaffe writes: "Fascinating and significant is the continuing tug-of-war between the federal courts and the Social Security Agency on the administration of the federal disability payments and the related 'disability freeze.' 'Total disability' is the key condition of entitlement. The applicant has the burden of proof and the agency findings are final if supported by the substantial evidence. A continuing stream of cases comes to the federal district and circuit courts attacking refusal of relief; and in reading them one is struck by their disposition to reject both the agency's interpretations of 'total disability' and its findings of fact." Jaffe, Judicial Control of Administrative Action 608 (1965).

peals Council adopted the examiner's finding:

"Claimant's present activities indicate strongly that with the acquisition of some stamina she could perform almost any task which would not require arduous or sustained, vigorous physical activity. Claimant is an educated, intelligent lady. She has an interest and knowledge of medical problems far beyond the average high school graduate. With proper health care, the claimant would be in physical condition to undertake training as a student nurse, training for practical nursing, x-ray, physical therapy, and many other similar fields which are suitable for a lady of her age and her educational background. In our economy at this time, there is a serious shortage of ladies who possess such training. * * * Inasmuch as the Examiner has concluded the claimant has not suffered any significant impairment that is not readily remediable, there is no need to further burden this decision with a lengthy recital of the jobs and opportunities the claimant can do within her many residual capabilities."

The Examiner could just as easily have translated his reference to the specific jobs which the claimant was capable of filling into the loose generalization on which the Court relies. I would hold that substantial non-medical as well as medical evidence supports the finding. However, in this area of administrative law, in striking contrast with all other areas, the "substantial evidence" standard is a test to be seen but not heard.[2]

## II.

The Court rests its holding on tests laid down in Gardner v. Smith, 5 Cir. 1966, 368 F.2d 77, and Bridges v. Gardner, 5 Cir. 1966, 368 F.2d 86.[3] These decisions distinguish away or overrule, sub silentio, the following recent Fifth Circuit decisions: Hicks v. Flemming, 302 F.2d 470; Celebrezze v. O'Brient, 323 F.2d 989;[4] Aldridge v. Celebrezze, 339 F.2d 190; Celebrezze v. Raley, 330 F.2d

2. "The disability benefit amendments to the Social Security Act have provided the federal courts with a severe test of their ability to deal effectively with an administrative process. In the nine years since Congress passed the first part of the disability program, agency determinations have fared poorly in the reviewing courts, to the extent that 35.3 per cent of the decisions rendered by the district courts have been reversals. While this percentage of reversals is unusual in itself, what is more significant is the fact that the percentage reflects a trend toward increasing judicial review of disability determinations. Furthermore, it is noteworthy that there has also appeared a trend toward use of the remand as a more subtle means of interfering with agency action." Rowland, Judicial Review of Disability Determinations, 52 Georgetown L.J. 42 (1963). "During the calendar year 1964 the district courts affirmed the Secretary's decision in 415 cases, reversed 239 cases, and remanded 277 cases for further consideration by the Department. Of the 277 remands, 137 were at the request of the Department, 31 were at the request of the plaintiff, and 109 on the Court's own motion. Letter from Arthur E. Hess, Director, Division of Disability Operations,

Department of Health, Education, and Welfare, to the Michigan Law Review, Feb. 25, 1965." Note, Social Security Disability Determinations: The Burden of Proof on Appeal, 63 Mich.L.Rev. 1465, 1466, n. 8 (1965).

3. I was a member of the panel in Bridges v. Gardner, but wrote no separate opinion. I agree with the result reached: remand of the case to the Secretary "for further proceedings generally" and also for "further proceedings in the light of the amendments to the Social Security Act." The Secretary requested the remand. He stated, among other reasons, that he intended to obtain "collateral medical and vocational development including consultative examinations" before finding that the claimant should undergo two surgical operations. The claimant had previously undergone five operations.

4. "This Court in O'Brient did not address itself to the issue whether the existing jobs for which a claimant is capable of performing must be found in the claimant's locale or in the national economy." Gardner v. Smith, 368 F.2d at 83.

Gardner v. Smith is perhaps the most carefully reasoned and documented opinion on the subject in this Circuit. See

755; Witherspoon v. Celebrezze, 328 F.2d 311; Frith v. Celebrezze, 333 F.2d 557; Robinson v. Celebrezze, 326 F.2d 840; Celebrezze v. Sutton, 8 Cir., 338 F. 2d 417; and Clinch v. Celebrezze, 328 F.2d 778.

In discussing this group of cases, a commentator has noted that:

"The minority view, which is most consistent with both the statutory language and the legislative history of the program, follows the position maintained by the Court of Appeals for the Fifth Circuit. This approach places upon the claimant the burden of proving not only that he is disabled from performing his usual occupation, but also that his impairments are so severe that they prevent him from engaging in *any* form of substantial gainful employment, including work of a physically or mentally lighter type. Thus, unless the claimant adduces unequivocal evidence of a medically-determined total and permanent disability, he must prove a broad negative—his *inability to do any substantial gainful work*—in order to receive benefits. In denying benefits, the Secretary may find it necessary to rebut the claimant's contention that his failure to obtain employment has resulted from his physical condition; however, under the Fifth Circuit approach, the Secretary need not prove the *availability* of specific employment conditions which the claimant can obtain and adequately perform. Consequently, courts adopting this view generally confine the Secretary's burden on an appeal to the production of credible evidence of the claimant's ability to do any kind of work, and are correspondingly hesitant to overrule the Secretary's finding."

Note, Social Security Disability Determinations: The Burden of Proof on Appeal, 63 Mich.L.Rev. 1465, 1466-67 (1965).

The effect of the instant case, Gardner v. Smith and, to a lesser extent, Bridges v. Gardner is to engraft upon the law the very thing Congress deliberately tried to avoid—definition of disability in occupational terms. These cases reject as "unrealistic" or merely "theoretical" the test: "ability of the claimant * * * to perform the work were he able to obtain the employment". Instead, the test is the claimant's "actual" employability. The Court does not go quite so far as to say that the Secretary must find vacancies available to a claimant, but the Secretary must prove, as an additional substantive element to negative disability, availability of actual employment to the claimant, in light of his skills and particular impairment. The effect is to shift to the Secretary part of the claimant's statutory burden of proving inability to engage in any substantial gainful activity and, ultimately, to shift to the Secretary the burden of persuasion. A further consequence of this Circuit's "realistic" test of disability is to require, "even though there is no present vacancy", a "reasonable expectation that the claimant may be expected to compete for such a job in the future". Thus the question is not whether available jobs "exist within the national economy"; the question is whether there is a "reasonable availability of jobs within the geographical areas within which the claimant would normally be expected to consider if regularly in the labor market". Gardner v. Smith, 368 F.2d at 83, citing Celebrezze v. Kelly, 5 Cir., 331 F. 2d 981.[5]

also, however, Harrison v. Gardner, 5 Cir. 1966, 369 F.2d 172; Tigner v. Gardner, 5 Cir. 1966, 356 F.2d 647; Alsobrooks v. Gardner, 5 Cir. 1966, 357 F.2d 110; and Moncrief v. Gardner, 5 Cir. 1966, 357 F.2d 651.

5. One court has said: "As a fact of life, employment is a matter of fortune. Surplus labor areas and types of available

employment differ in most sections of the country. In this progressive and scientific age, government agencies alone or in combination may have the knowhow to survey such situations with reasonable certainty of prediction. But to particularize that a certain human being with individualistic impairment and limitation may or may not have employment opportunity in a certain area, in my inexperi-

In the instant case the Court seems to think that the appropriate labor market is Mt. Vernon, Texas (1960 population: 1338). See footnote 7 to the Court's opinion.

The Court's willingness to consider job availability only in a limited—in this case, a very limited—geographic area clearly ties occupational terms into the definition of disability. I say again: "Congress might well have defined disability in broad terms under the Social Security Act and related it to unemployment by qualifying 'any substantial gainful activity' with the words 'available in the claimant's immediate working area' or similar words. That is not the statutory test; the Act is not an unemployment compensation law." Celebrezze v. O'Brient, 5 Cir. 1963, 323 F.2d 989, 992.

### III.

The commentators are in agreement with the Secretary in his reading of the legislative history of the disability program. "As the Secretary has pointed out [U.S. Code Cong. & Admin. News, 83 Cong.2d Sess. 1954, p. 3730], the legislative history of the disability program strongly suggests that the occupational test was not intended by Congress", Longshore, The Social Security Disability Insurance Program—An Example of the Necessity for Judicial Review of Administrative Decisions, 25 Ala.Law. 282, 293 (1964). "It is to be noted that the statute did not contemplate an occupational disability. * * * [Interpretations that the plaintiff has carried his burden if he has shown] occupational dis-

ability and inability to perform work available in his vicinity * * * plainly thwart congressional intent and fly in the face of statutory language". Rowland, Judicial Review of Disability Determinations, 52 Geo.L.J. 42, 53, 79 (1963). "However, requiring the introduction of evidence of actual employment opportunities as an additional element necessary to support the Secretary's disallowance of a claim seems untenable. The legislative history and language of the Social Security Act clearly prohibit consideration of this factor in determining disability. Moreover, taking account of specific job opportunities in the immediate geographical area brings the program very close to granting compensation for mere unemployment rather than for physical or mental disability. If the availability of employment opportunities is to be recognized to some degree as a substantive element in determining disability (as certainly it is under current judicial practice) the Secretary's superior access to employment and vocational information and the policy considerations discussed above perhaps justify allocating to him the burden of proving the availability of particular jobs in the *national* labor market." Note, Social Security Disability Determinations: The Burden of Proof on Appeal, 63 Mich.L. Rev. 1464, 1472 (1965).

The legislative history of the law is replete with statements that the definition of disability is "strict" or "conservative".[6] Congress devised the disability insurance system to meet the problems of the permanently disabled,[7] carefully

---

enced judgment, may require an elite group of soothsayers superbly trained to probe the many intangibles." Stoliaroff v. Ribicoff, N.D.N.Y.1961, 198 F.Supp. 587, 591.

6. See H.R.Rep.No. 1189, 84th Cong., 1st Sess. 5 (1956); S.Rep.No. 1987, 83d Cong., 2d Sess. 21 (1954), U.S.Code Cong. & Admin.News, 1954, p. 3710.

7. "The term disability means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be *expected to result in death or to be*

*of long-continued and indefinite duration.*" § 216(i), 42 U.S.C. § 416(i) (1) (A); § 223, 42 U.S.C. § 423(c) 2). See H.R. 6000, 81st Cong., 1st Sess. (1949). See Advisory Council on Social Security, Reports to the Senate Comm. on Finance, S.Doc.No.162, 80th Cong., 2d Sess. 4 (1948). "The legislative history of the program indicates Congress thought a rational determination [of disability] was possible without such evidence [of employment opportunities]. Consistent with its habit of providing social legislation on a piecemeal basis for

worded the statutory requirement that the claimant be "unable to engage in any substantial gainful activity," and put the burden of proof on the claimant.[8] Congress was afraid that a loose application of the law would endanger the Old Age Survivors Insurance trust fund.[9]

Since it first appeared in the 1952 amendments to the Social Security Act (66 Stat. 771) the definition of "disability" has been virtually the same. The definition has always required an ability to engage in any substantial gainful activity by reason of a physical or mental impairment. From the very first Congress equated "disability" with "total disability". House Rep. No. 1944, 82nd Cong., 2d Sess., p. 2; Conf. Rep., House Rep. No. 2491, 82nd Cong., 2d Sess., U.S. Code Cong. & Admin.News 1952, p. 2363; House Rep. No. 1698, 83rd Cong., 2d Sess., pp. 22–24; Senate Rep. No. 1987, 83rd Cong., 2d Sess., pp. 20–22, U.S. Code Cong. & Admin.News 1954, p. 3710. Moreover, Congress contemplated that a person would have to be precluded from *any* work before he would be considered disabled. House Rep. No. 1698, 83rd Cong., 2d Sess., at p. 23; Senate Rep. No. 1987, 83rd Cong., 2d Sess., at p. 21:

> The physical or mental impairment must be of a nature and degree of severity sufficient to justify its consideration as the cause of failure to obtain any substantially gainful work. Standards for evaluating the severity of disabling conditions will be worked out in consultation with the state agencies. They will reflect the require-

ment that the individual be disabled not for his usual work but also for any type of substantially gainful activity. U.S.Code Cong. & Admin.News 1954, p. 3730.

There was no change in 1956 when the disability insurance benefits provisions were enacted. House Rep. No. 1189, 84th Cong., 1st Sess., pp. 2, 5, 28; Conference Rep., House Rep. No. 2936, 84th Cong., 2d Sess., p. 26, U.S.Code Cong. & Admin. News 1956, p. 3877. In its report, the House Committee on Ways and Means said (House Rep. No. 1189, 84th Cong., 1st Sess., p. 5):

> Thus, an individual who is able to engage in any substantial gainful activity will not be entitled to disability insurance benefits *even though he is in fact severely disabled.* (Emphasis added.)

Uniform application of the disability provisions of the Social Security Act would be precluded, as a matter of definition, if the test of disability should turn on the availability of jobs a claimant could perform in his home community. The legislative history of the Social Security Act, however, explicitly requires uniform application of the disability provisions. The House Committee on Ways and Means, reporting on H.R. 9366 (containing the provisions for a disability wage freeze), commented that state agencies were to apply the standards developed for evaluating the severity of impairments:

> This will promote *equal treatment of all disabled individuals* under the old-age and survivors' insurance system in

---

specially defined groups of beneficiaries, Congress attempted to protect those persons whose disability reflected physical or mental impairment rather than an employer's imprecise reaction to their condition or the existence of a market for their services. 'Inability to engage in any substantial gainful activity' was the qualification. That phrase was left to the Secretary for administrative development, but it seemed clear the claimant would not qualify if a man of his education, experience and capacity could perform any work, however inaccessible or ideal." Rowland, Judicial Review of Dis-

ability Determinations, 52 Georgetown L.J. 42, 83 (1963).

8. "An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required." 42 U.S.C. § 416(i) (1).

9. 101 Cong.Rec. 10772, 10776, 10779, 10782–83 (1955); S.Rep. No. 2133, 84th Cong., 2d Sess. 2 (1956); 101 Cong.Rec. 10778 (1955). See also 1956 Amendments § 103(e), 70 Stat. 819, 42 U.S.C. § 401(b) (1958).

*all states.* (Emphasis added.) (House Rep. No. 1698, 83rd Cong., 2d Sess., p. 24)

See also Senate Rep. No. 1987, 83rd Cong., 2d Sess., pp. 20–22, U.S.Code Cong. & Admin.News 1954, p. 3730. Similarly, the Conference Report on the H.R. 7225, 84th Cong., 1st Sess. stating that the purpose of having the Secretary of Health, Education and Welfare review the disability determinations of state agencies was (House Rep. No. 2936, 84th Cong., 2d Sess., p. 26):

> To assure uniform administration of the disability benefits and to protect the Federal Disability Insurance Trust Fund from unwarranted costs.

Finally, a report of the House Committee on Ways and Means, H. Rep. No. 213, 89th Cong., 1st Sess., pp. 87, 88, U.S. Code Cong. & Admin.News 1965, p. 1943, in regard to the 1965 amendments to the Social Security Act, notes that in providing disability benefits "Congress designed a conservative program". The report states:

> In line with the original views expressed by our committee and since reaffirmed, to be eligible an individual must demonstrate that he is not only unable, by reason of a physical or mental impairment, to perform the type of work he previously did, but that he is also unable, taking into account his age, education, and experience, to perform any other type of substantial gainful work, *regardless of whether or not such work is available to him in the locality in which he lives.* (Emphasis added.)

> \* \* \* \* \* \*

I am as ready as the next judge to fill interstices in federal statutes. To the best of my ability, I guard zealously the judicial function. Moreover, I recognize the hiatus between disability and unemployability in our social security legislation. But Congress deliberately created this hiatus. It is for Congress to fill.

### On Petition for Rehearing En Banc

**PER CURIAM:**

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25a, subpar. (b), the Petition for Rehearing En Banc is denied. ·

### On Application for Rehearing En Banc.

Before BROWN, Chief Judge, and TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON and CLAYTON, Circuit Judges.

**PER CURIAM:**

A member of the Panel in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc. The Clerk will specify a briefing schedule for the filing of supplemental briefs as desired.

### On Rehearing En Banc.

The Court on its own motion has heretofore ordered this case to be reheard en banc. Since that time the statute has been amended by P.L. 90–248, 81 Stat. 821 (approved Jan. 2, 1968), § 158(b) providing, among other things, the following:

"(2) For purposes of paragraph (1) (A)—

(A) an individual (except a widow, surviving divorced wife, or widower for purposes of section 202(e) or (f)) shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."

The Act further provides that it is applicable to cases pending in courts where "the decision in such civil action has not become final" prior to its effective date (January 2, 1968). P.L. 90–248, § 158(e)(2)(B).

The Court is of the opinion that because of these statutory changes the case should be reconsidered by the Secretary in the light of the new statute. Accordingly, the Court takes this action. The prior order putting the case en banc is vacated. The opinion and judgment of the panel of August 29, 1967, is likewise vacated. The judgment of the District Court is vacated. The cause is remanded to the District Court with directions to remand it to the Secretary for further proceedings in the light of the statutory changes.